UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

---

UNITED FOOD AND COMMERCIAL
WORKERS INTERNATIONAL
UNION-INDUSTRY PENSION FUND,
MARC PERRONE (TRUSTEE), AND
WALTER B. BLAKE (TRUSTEE)

                         Plaintiffs,

            v.

THE BANK OF NEW YORK MELLON

                    Defendant.

Case No. 13 CV 4484

---

## COMPLAINT

---

Plaintiff, the United Food and Commercial Workers International

Union-Industry Pension Fund, and two of its Trustees, Marc Perrone and Walter

B. Blake (collectively, the "National Fund"), for its complaint against Defendant,

the Bank of New York Mellon ("BNY Mellon"), allege as follows:

### INTRODUCTION

1.      The National Fund brings this action to recover losses and seek

equitable relief for injury caused to it by BNY Mellon's breach of its obligations

under the BNY Mellon securities lending program and fiduciary duties under the

Employee Retirement Income Security Act of 1974, as amended ("ERISA").

The National Fund participated in BNY Mellon's securities lending program,

which was invested and managed by BNY Mellon for the benefit of the National

Fund, and incurred losses due to BNY Mellon's breach of its obligations under its securities lending program and its failure to discharge its fiduciary duties owed to the National Fund with the care, skill, prudence and loyalty required of BNY Mellon. The National Fund also was harmed as a result of BNY Mellon engaging in prohibited transactions and placing its own interests before those of the National Fund in violation of its fiduciary duties under ERISA.

## PARTIES

2.      The National Fund is an "employee benefit plan" within the meaning of ERISA § 3(3), 29 U.S.C. § 1002(3), and is established and maintained pursuant to section 302(c)(5) of the Labor Management Relations Act of 1947, 29 U.S.C. § 186(c)(5).  The National Fund is a multi-employer plan under ERISA § 3(2) and (37), 29 U.S.C. § 1002(2) and (37).

3.      The National Fund is administered by a joint Board of Trustees, composed equally of representatives of employers and employees, which serves as "Plan Sponsor" and "Administrator" of the Fund within the meaning of ERISA § 3(16), 29 U.S.C. § 1002(16).  Marc Perrone and Walter B. Blake are each a Trustee serving on the Board of Trustees of the National Fund.  The National Fund is administered in Chicago, Illinois.

4.      Upon information and belief, in 2007, The Bank of New York Company, Inc. and Mellon Financial Corporation merged into the Bank of New York Mellon Corporation, with BNY Mellon being the surviving entity.  BNY Mellon provides investment management asset, custody and fiduciary and

banking services for corporations, institutions and individuals.  BNY Mellon is a "fiduciary" to the National Fund under ERISA, which is also expressly stated in various agreements between the National Fund and BNY Mellon.

## JURISDICTION AND VENUE

5.     The Court has jurisdiction to hear this matter pursuant to ERISA § 502, 29 U.S.C. § 1132.

6.     Venue is proper in this Court under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Fund is administered in this district.

## FACTUAL ALLEGATIONS

**A.     BNY Mellon's Securities Lending Arrangement With the National Fund**

7.     On January 1, 1994 the National Fund entered into a written Custodian Agreement ("1994 Custodian Agreement") with Bankers Trust Company.

8.     In 2003, the National Fund selected the Bank of New York (now known as BNY Mellon) to serve as successor custodian to Bankers Trust Company.  On February 3, 2003 the National Fund and BNY Mellon entered into a Successor Custodian Agreement ("Custodian Agreement") by which BNY Mellon agreed to serve as successor custodian of the assets of the National Fund, which were held in a custodian account for the National Fund (the "Account").

9.     BNY Mellon promoted its securities lending program to the National Fund as having "Superior Risk Controls," "Comprehensive Securities

Lending Safeguard," "Collateral and Reinvestment Risk safeguards" and the "Ability to monitor performance and risk compliance." In addition, BNY Mellon described securities lending collateral reinvestments to be made in "short-term high quality money market instruments," specifically stating that its goal was not to rely on "more aggressive investment objectives." Moreover, BNY Mellon asserted that this promised focus on low-risk "positions our clients and the Bank to expect a consistent securities lending income stream without sacrificing safety."

10.     In the Custodian Agreement, the National Fund and BNY Mellon agreed that their duties, rights and liabilities shall be determined by the terms of the 1994 Custodian Agreement and that effective February 3, 2003, BNY Mellon became a party to the 1994 Custodian Agreement in place of Bankers Trust Company in the same manner and to the same extent as if it had executed the 1994 Custody Agreement. Under the Custodian Agreement, BNY Mellon specifically acknowledged that it was acting as a "fiduciary" within the meaning of ERISA § 3(21) with respect to the Securities Lending Arrangement. The Custodian Agreement also provides that BNY Mellon shall be liable for its own negligence, omissions, unauthorized acts, defaults and other breaches of Trust under the Custodian Agreement.

11.     Under the Custodian Agreement, BNY Mellon held in an Account or Accounts for the National Fund such funds and securities received by BNY

4

Mellon, income or other amounts received, and the proceeds, investments and reinvestments thereof.

12.     The National Fund authorized BNY Mellon to lend securities in the Account to brokers, dealers, banks or other financial institutions, provided that any securities loaned were secured by collateral in the form of cash, government securities or irrevocable bank letters of credit at least equal in value to 102% of the market value of the securities loaned (the "Securities Lending Arrangement").

13.     Under the Securities Lending Arrangement managed by BNY Mellon, the National Fund loaned securities to certain borrowers vetted by BNY Mellon.  The borrower deposited cash collateral equal to 102% of the value of the loaned securities (the "Collateral Pool").  BNY Mellon negotiated a rate of interest to be paid to the borrower on its Collateral Pool which was the cash collateral in the Collateral Pool ("Borrower Rebate").  BNY Mellon then invested the cash collateral provided by the borrower.

14.     The spread between the actual return on investment of the Collateral Pool and the Borrower Rebate is split by BNY Mellon and the National Fund with 80% payable to the National Fund and 20% payable to BNY Mellon.  Although BNY Mellon benefitted from the returns on investments by the Collateral Pool, the National Fund alone bore the entire credit risk and interest rate risk on the investments in the Collateral Pool. Therefore, BNY Mellon had the incentive to invest the cash collateral in longer term investments

because longer term investments tend to yield higher interest rates. Only the National Fund was responsible for compensating the Collateral Pool for any shortfall resulting from an investment that defaulted or experienced a loss.

15.    The National Fund's investment guidelines for securities lending and the related Collateral Pool investments ("Guidelines") prohibit investments in structured notes "unless specifically allowed in writing." The Guidelines also prohibit the use of derivatives, including Structured Investment Vehicles ("SIVs"), to achieve leverage or for speculation. Under the Guidelines, "[t]he securities lending manager is expected to diversify its portfolio to avoid large losses. The securities lending manager is responsible for notifying the trustees if in their judgment it is imprudent to manage these assets within any of these guidelines."

16.    The opportunity to achieve some return in exchange for lending securities to third parties on what was represented by BNY Mellon as a risk free arrangement, with BNY Mellon assuming all risk for failure of a borrower to return securities loaned, was a significant factor that caused the National Fund to participate in the Securities Lending Arrangement. The value for lending securities was achieved by investing the collateral posted by the borrower in short-term investments designed to preserve principal and be liquid, and this purpose was also reflected in the terms of the Custodian Agreement and the Guidelines. The purpose of the Securities Lending Arrangement was to enable the National Fund to earn interest on safe investments with short-term maturity

6

held in the Collateral Pool. As such, investments appropriate for the Collateral Pool are interest bearing, short maturity and highly liquid debt obligations that are designed to provide liquidity and stability of value to keep the constant price per share of one dollar. The expectation of the National Fund, based on the representations by BNY Mellon and the purpose of the Collateral Pool as explained by BNY Mellon, was that the Securities Lending Arrangement with BNY Mellon was an extraordinarily safe investment with the only risk being the risk of a borrower default, and that risk of borrower default was covered through an indemnity arrangement with BNY Mellon.

**B.     BNY Mellon Investment - Lehman Brothers Note**

17.     BNY Mellon held a limited number of securities in the Collateral Pool with a heavy concentration in financial services company debt instruments.

18.     On or about March 23, 2007, BNY Mellon purchased a $20 million, two-year quarterly reset note issued by Lehman Brothers Holdings, Inc. (the "Lehman Note" and "Lehman Brothers," respectively). The Lehman Note was a medium term floating rate note. At the time of its purchase, it represented about 5% of the Collateral Pool, a large and disproportionate allocation to a single security and to one that was substantially exposed to real estate and subprime stress.

19.     Investment in a medium term note like the Lehman Note, which is essentially a "buy and hold" approach, is not an appropriate strategy for a securities lending program because a securities lending program is designed to

preserve principal and provide liquidity. BNY Mellon essentially disregarded objectives relating to the National Fund's participation in the Securities Lending Arrangement and instead invested cash collateral in risky, longer-dated instruments with higher interest rates that were less liquid and exposed the Collateral Pool to substantial credit risk.

20.     Upon information and belief, BNY Mellon failed to investigate properly the creditworthiness of Lehman Brothers at the time the Lehman Note was purchased and failed to monitor Lehman Brothers' deteriorating creditworthiness while it continued to hold the Lehman Note on behalf of the National Fund.

21.     At the time of purchase, BNY Mellon knew or should have known that the Lehman Note was not suitable for investment for the Collateral Pool and was inconsistent with the primary purpose of the Collateral Pool investments of preserving capital and maintaining liquidity.

22.     Further, BNY Mellon knew or should have known that Lehman Brothers had heavily invested its own capital in securities linked to the U.S. subprime mortgage market, which was known to be in crisis during 2007 and afterwards. The riskiness of investments involving subprime mortgages had been identified. Increasing numbers of subprime mortgages that had been issued were projected to fail. For example, during the latter part of 2007, several subprime lenders failed or ceased making loans, including Wells Fargo & Co,

8

BNC Mortgage (an affiliate of Lehman Brothers) and Decision One Mortgage (an affiliate of HSBC Finance).

23.     For the June to August period of 2007, Lehman Brothers stated that it would take write downs of $700 million as it adjusted the value of its investments in residential mortgages and commercial property.  By the following year, this number had increased to $7.8 billion.  Lehman Brothers also reported that it still had $54 billion in exposure to hard-to-value mortgage-backed securities.  Indications of the market's estimate of the probability of Lehman Brothers' demise were implicit in the increasing prices of credit default swaps on Lehman Brothers in 2008.  Moreover, the prices of credit default swaps for Lehman Brothers demonstrated a greater default probability compared to other similar investment banks, such as Goldman Sachs, Citigroup and Merrill Lynch.

24.     This radical change in the market's assessment of Lehman Brothers' bankruptcy probabilities was known or should have been known and should have been acted on by BNY Mellon.  Particularly following the rescue and fire sale of Bear Stearns Companies, Inc. ("Bear Stearns") in March 2008, BNY Mellon knew or should have known that Lehman Brothers, and thus the Lehman Note, was at risk.  In the months following Bear Stearns' rescue, it was apparent that other investment banks, especially Lehman Brothers, were vulnerable to the same fate.

25.     The rescue and fire sale of Bear Stearns during March 2008 was a seminal event during the financial crisis.  It indicated that the financial crisis was

severe. During that time, credit and counterparty risk should have been BNY Mellon's primary focus in protecting its clients. In the months that followed Bear Stearns' rescue, it was apparent that other investment banks, especially Lehman Brothers, were vulnerable to the same fate.

26. It became increasingly apparent, upon information and belief, to BNY Mellon, that there was significant uncertainty surrounding Lehman Brothers' financial stability because of the subprime mortgage crisis. Beginning in early 2008, the credit rating agencies Moody's and Standard & Poor's progressively reduced Lehman's credit rating and outlook. Lehman's stock price dropped 95 percent from $62.19 on January 2, 2008 to $3.65 by September 12, 2008. On June 2, 2008, Standard and Poor's downgraded Lehman due to business weakness and the potential for further write-offs. On June 16, 2008, Moody's put Lehman Brothers on review for downgrade.

27. On September 8, 2008, Standard and Poor's indicated that Lehman Brothers' rating was under review for a downgrade. On September 10, 2008, Lehman Brothers reported a larger than anticipated third quarter loss and announced that it was taking action to attempt to stabilize its position. Both Moody's and Standard & Poor's publicly stated that they would downgrade Lehman Brothers if a transaction saving the firm did not materialize. The National Fund's unsecured purchase of the $20 million Lehman Note was subject to imminent risk of losing significant principal value.

28.     In addition, upon information and belief, BNY Mellon's business relationship with Lehman Brothers caused BNY Mellon to place its own interests and those of Lehman Brothers above the interests of the National Fund. The Examiner's Report in the bankruptcy of Lehman Brothers sheds light on BNY Mellon's intimate knowledge of Lehman Brothers' financial condition in the weeks leading up to its bankruptcy. (Report of Anton R. Valukas, Examiner, Doc. No. 7531, *In re Lehman Bros. Holdings Inc., et al.*, No. 08-13555 (Bankr. S.D.N.Y. March 11, 2010) ("Lehman Report").)  BNY Mellon provided account support to Lehman Brothers for its European commercial paper trading program and account and financing support for its medium-term note issuances and redemptions.  (Lehman Report at 1376.)  As of 2008, Lehman Brothers invested more than $15 billion dollars with BNY Mellon and, as a result, on information and belief, BNY Mellon reaped significant fees from Lehman Brothers. (Lehman Report at 1379.)  Upon information and belief, BNY Mellon's conflict of interest concerning its business relationship with Lehman Brothers ultimately motivated it to continue investing a portion of the National Fund's Collateral Pool in the unsecured $20 million Lehman Note after it was no longer prudent to do so.

29.     As of April 2008, the Lehman Note remained in the Account, valued at 97.37% (as to the $1.00 mark), and continued to constitute approximately 5% of the Collateral Pool.  As of July 2008, its price held at 97.04%.  After Lehman Brothers' bankruptcy by October 2008, the value of this

note fell to 11.75%, representing an unrealized loss to the National Fund of over $17 million.

30.     Throughout the entire time period described above, BNY Mellon took no action regarding the Collateral Pool's investment in the Lehman Note and made no effort to mitigate the National Fund's losses by selling part or all of the investment.

31.     Upon information and belief, BNY Mellon failed to use proper monitoring techniques to monitor the Lehman Note, specifically, and critically, with respect to subprime and credit risk in the Collateral Pool.  Upon information and belief, BNY Mellon instead followed a buy-and-hold approach that is fundamentally inconsistent with a securities lending program approach in which participants such as the National Fund expect to be able to access cash collateral on a short-term basis.

32.     Upon information and belief, BNY Mellon failed to act prudently to protect the Collateral Pool regarding the implications on the financial sector of subprime mortgage issues, which were known to the market and to BNY Mellon, and failed to take prudent steps to divest all or part of the Lehman Note exposure from the Collateral Pool as it continued to decrease in value during 2008. Instead, BNY Mellon continued holding the Lehman Note up until Lehman Brothers filed for bankruptcy, adversely impacting other financial sector holdings, and the Lehman Note became virtually worthless.

33.     During 2012, BNY Mellon sold the Lehman Note in three transactions for a total of $4,940,428.41, or about 24.7% of par value.

34.     After the loss was incurred by the National Fund on the Lehman Note when Lehman Brothers filed for bankruptcy, BNY Mellon agreed to contribute its future fees under the National Fund Securities Lending Arrangement up to a value of 20% of the realized loss on the Lehman Note. Accordingly, $2,770,433.25 of the National Fund loss was offset by the fee waiver and the net realized loss of the National Fund on the Lehman Note was reduced to $11,081,733.02.

35.     Had BNY Mellon divested the Collateral Pool of the Lehman Note at any time before Lehman Brothers announced its bankruptcy, BNY Mellon would have substantially reduced or eliminated losses incurred by the National Fund.

**C.     BNY Mellon Investment – Sigma Finance**

36.     BNY Mellon also purchased for investment in the Collateral Pool a $15 million dollar SIV through Sigma Finance Corporation ("Sigma Finance") on March 15, 2007 at a price of 99.86 ("Sigma Note").

37.     A SIV is a financial construct in which term debt instruments, often mortgages, mortgage-backed securities or collateralized debt obligations ("CDOs"), are purchased through capital raised from issuing short-term debt such as commercial paper. The short-term financing is rolled over during the term of the vehicle so that SIVs essentially borrow short and invest longer.

Often, SIVs additionally used leverage and derivative structures or both to further enhance the expected profit. Often, the underlying longer-term assets invested in by the SIV are themselves structured securities with extensive subprime exposure.

38.     Upon information and belief, BNY Mellon failed to investigate, analyze and track the investment characteristics of the Sigma Note. This is true even though BNY Mellon acknowledges that the type of assets Sigma Finance invested in are "not widely held or regularly traded (e.g., ABSs, CMEs, CDOs, CLOs, CBOs, CDSs)."

39.     Upon information and belief, BNY Mellon knew or should have known that SIVs were inherently prone to losses because, unlike other commercial paper conduits, SIVs typically maintained a very short period of liquidity and generally had no further substantial liquidity backstop. In addition, SIVs were invested in securities that BNY Mellon has acknowledged are not regularly traded. SIVs are an inherently volatile structure because they lack a financial backstop and employ levered investment strategies by investing in potentially illiquid, longer-term assets.

40.     Unlike other SIVs that failed, which were subsidiaries of, or had been set up by, major banks that stepped in to support these investments, Sigma Finance was a stand-alone entity and had no investment or commercial bank backing it. Sigma Finance invested in financial company securities and CDOs; it financed itself initially with medium-term notes; Sigma Finance used derivatives

14

to hedge currency and interest rate risk. Eventually, Sigma Finance was unable to post margin on reverse repurchase agreements (i.e., Sigma Finance borrowed cash by delivering securities that it promised later to repurchase or redeem) and Sigma Finance defaulted.

41.    BNY Mellon knew or should have known that SIVs, including the Sigma Note, were at high risk of becoming illiquid and that any investment in a SIV, including the Sigma Note, was not consistent with the purpose of the Collateral Pool of maintaining liquidity and protecting principal.

42.    Furthermore, in 2007, analysts and various news outlets began to report that liquidity in the credit market and sharp declines in the market value of assets backing many SIVs had already forced the world's major SIVs to sell assets to support their revolving debt.

43.    On June 21, 2007, two hedge funds, created and managed by a subsidiary of the now-defunct Bear Stearns whose investment strategy relied on financing its investment activities by borrowing against long-term assets like mortgage-backed securities, faced a liquidity crisis as the hedge funds' lenders were reluctant to lend money to an entity whose collateral was principally based on mortgage-backed securities. Bear Stearns had to bail out the hedge funds and in August 2007, shut them down. The collapse of the Bear Stearns hedge funds fueled a liquidity crisis among SIVs that held assets similar to these hedge funds. Between August and October 2007, more than a dozen SIVs failed following rating agencies' downgrades based on the declining quality of their assets. Thus,

by the middle of 2007 and extending through 2008, other SIVs with structures similar to the Sigma Note had defaulted and gone into liquidation.

44.     Given the reports concerning numerous failures of SIVs in general, and more specifically, Sigma Finance's inability to secure the financing it would need to survive beyond the near term, BNY Mellon knew or should have known the dire financial conditions facing Sigma Finance by the end of January 2008. Upon information and belief, BNY Mellon failed to monitor the deteriorating condition of Sigma Finance and its exposure to subprime and related assets and followed instead a buy-and-hold approach that was fundamentally inconsistent with the purpose of the Securities Lending Arrangement to preserve principal and maintain liquidity.

45.     As of April 2008, the market price for the Sigma Note had fallen to less than 70% of its face amount.  Only in May 2008 did BNY Mellon become concerned with the Sigma Note and made arrangements to swap it for other investments.  The 30% loss in value of the Sigma Note caused the National Fund to incur a realized loss of approximately $5 million.

46.     Had BNY Mellon divested the Collateral Pool of the Sigma Note at the time it knew or should have known of the risk posed by holding the Sigma Note, BNY Mellon would have reduced or eliminated any losses incurred by the National Fund.  BNY Mellon failed to act as a reasonably prudent fiduciary by failing to sell the Sigma Note before May 2008.

47.     BNY Mellon's decision to buy and hold the Sigma Note violated the Guidelines.  Further, in general, but especially because the underlying portfolio of Sigma Finance made use of leverage and derivatives, BNY Mellon had an obligation to stress test the investments in Sigma Finance but failed to do so.

**D.     BNY Mellon Engaged in Prohibited Transactions.**

48.     Upon information and belief, BNY Mellon has dealt with the assets of the plan in BNY Mellon's own interest and for its own account by selecting risky, longer-term cash collateral investments in order to enhance its return while the National Fund bore the risk.  The Collateral Pool investments that BNY Mellon selected for the National Fund were more likely to decline in principal value over time, thus causing the Collateral Pool to suffer a deficiency.  Yet, BNY Mellon bore none of the risk if the instrument lost principal value or defaulted.  Accordingly, upon information and belief, BNY Mellon was motivated by its own financial interest to invest the Collateral Pool account in these instruments to reap greater financial benefits while avoiding the risks that accompany such investments.  As such, BNY Mellon put its own interest in receiving compensation above its duty as a fiduciary to protect the National Fund's assets.

49.     Upon information and belief, BNY Mellon has acted in transactions involving the plan on behalf of a party (itself) whose interests are adverse to the interest of the plan (here, the National Fund) or the interests of its

participants and beneficiaries. BNY Mellon engaged in a series of transactions involving the National Fund in which BNY Mellon's interest in earning compensation was adverse to the National Fund's interest, and that of its participants and beneficiaries, in preserving the National Fund's assets. For example, BNY Mellon purchased and held longer-term, floating rate mortgage-backed securities to increase BNY Mellon's own compensation, as longer-term instruments typically yield higher interest rates. At the same time, BNY Mellon's investment in these instruments increased the National Fund's risk of having to make up the shortfall in their principal value because the longer an instrument is held, the greater chance that it will decrease in principal value or suffer a credit rating downgrade.

50.     Similarly, BNY Mellon continued to hold the Lehman Note and receive compensation generated from the cash collateral investment even as the Lehman Note's credit ratings and principal value—as well as Lehman Brothers' stock price (Lehman Report at 11)—steadily declined.

51.     As the Lehman Note's principal value declined, the interests of BNY Mellon and the National Fund diverged. In August 2008, BNY Mellon "believed it bore intra-day credit risk from Lehman" and requested additional collateral from Lehman Brothers. (Lehman Report at 1839.) Meanwhile, upon information and belief, BNY Mellon did not notify the National Fund that it demanded additional collateral from Lehman Brothers or that the Lehman Note may be at risk of default. Instead, BNY Mellon continued holding the National

Fund's unsecured $20 million cash collateral investment in the Lehman Note. Upon information and belief, BNY Mellon put itself in a position where it had an incentive to hold the Lehman Note, which would continue paying interest monthly regardless of its principal value (unless the note defaulted), because BNY Mellon bore no risk while the Lehman Note's principal value declined over time until the Lehman Brothers bankruptcy. The National Fund, on the other hand, was increasingly exposed to the possibility of paying for a collateral deficiency if the principal value of the note remained below par, and thus the National Fund had an interest in protecting itself from the collateral deficiency that would occur if the note was not paid off in full or defaulted.

## COUNT I

## VIOLATION OF ERISA § 404 (29 U.S.C. § 1104)

52.     The National Fund repeats and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

53.     At all relevant times, BNY Mellon acted as a fiduciary within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), as expressly recognized in the Custodian Agreement and by exercising authority or control with respect to the management or disposition of the Collateral Pool, which is a plan asset of the National Fund.

54.     BNY Mellon breached its fiduciary obligations under ERISA, the Custodian Agreement and the Guidelines to, among other things, loan the National Fund's securities and invest the Collateral Pool prudently based on the

standards of a reasonably prudent fiduciary, diversify the Collateral Pool investments to limit the risk of large losses, loan the National Fund's securities and invest the Collateral Pool solely in the exclusive interest of the National Fund and its participants and beneficiaries.

55.     BNY Mellon had a duty to invest the Collateral Pool prudently based on the standards of a reasonably prudent fiduciary.  Included within BNY Mellon's duty to invest the Collateral Pool prudently was a duty to appropriately diversify the investments.

56.     BNY Mellon had a duty of loyalty to invest the Collateral Pool solely in the exclusive interest of the National Fund and its participants and beneficiaries.

57.     BNY Mellon had a duty to monitor investments in the Collateral Pool continuously to ensure that they were at all times proper.  As part of its duty to monitor investments, BNY Mellon had an obligation to stress test the investments in the Collateral Pool under various market conditions to ensure that the investments were consistent with the overall purpose of the Securities Lending Arrangement to safeguard principal and maintain liquidity.  If an investment within the Collateral Pool became imprudent or improper at any time, BNY Mellon had a duty to act immediately to protect the National Fund from any investment harm.

58.     BNY Mellon breached its fiduciary obligations because it failed to monitor the investments in the Collateral Pool to ensure they were at all times

proper investments in accordance with the Custodian Agreement and the Guidelines, as well as in keeping with the overall purpose of the Securities Lending Arrangement to safeguard principal and maintain liquidity, and therefore, improperly maintained investments in the Collateral Pool after it knew or should have known those investments were imprudent.

59.    BNY Mellon breached its fiduciary obligations because it failed to follow the Custodian Agreement and the Guidelines, which are plan documents.

60.    Upon information and belief, BNY Mellon's actions were designed to increase profits earned by BNY Mellon from securities lending and disregarded the risk of losses that could be suffered by the National Fund.  Upon information and belief, BNY Mellon favored its own interests by taking higher risks to make profits without reasonable consideration to losses that could be suffered by the National Fund.  Upon information and belief, BNY Mellon's use of this investment strategy that was risky for the National Fund and contrary to the National Fund's primary purpose of its investment in the Collateral Pool of preserving capital and maintaining liquidity was for BNY Mellon's own benefit and was a violation of BNY Mellon's duty of loyalty under ERISA.

61.    BNY Mellon breached its fiduciary duties to the National Fund by investing the Collateral Pool in the Lehman Note and the Sigma Note when a reasonably prudent fiduciary would have known these investments were fundamentally inconsistent with the purpose of the Securities Lending

Arrangement and the Guidelines to preserve principal and maintain liquidity, and which were risky and inappropriate in light of known existing market conditions.

62.     BNY Mellon is liable under ERISA § 409 for causing loss to the National Fund because of its fiduciary breaches under ERISA § 404, and pursuant to ERISA § 502(a)(2) is liable to restore to the National Fund all losses due to BNY Mellon's breaches as well as any profits that would have been earned had the Collateral Pool been prudently invested.

## COUNT II

## VIOLATION OF ERISA § 406 (29 U.S.C. § 1106)

63.     The National Fund repeats and re-alleges the allegations contained in the paragraphs above as if fully set forth herein.

64.     BNY Mellon specifically acknowledged under the Custodian Agreement that it was acting as a "fiduciary" within the meaning of ERISA § 3(21)(A) and did, in fact exercise authority and control concerning the management or disposition of the Collateral Pool, which is a plan asset.  As a fiduciary, BNY Mellon was obligated to avoid engaging in transactions prohibited by ERISA § 406.

65.     BNY Mellon's acts and omissions violated ERISA § 406(b) , 29 U.S.C. § 1106(b) in that BNY Mellon dealt with the Collateral Pool of the National Fund in its own interest or for its own account and acted in a transaction involving the National Fund's Collateral Pool on behalf of itself, a

party whose interests are adverse to the interests of the National Fund and its participants and beneficiaries.

66.     As a direct and proximate result of the acts and omissions alleged herein, the National Fund sustained substantial losses.  For this reason, BNY Mellon's investment of the National Fund's assets in the Collateral Pool violated ERISA § 406(b).

67.     BNY Mellon is liable under ERISA § 409 for causing loss to the National Fund because it engaged in prohibited transactions under ERISA § 406, and pursuant to ERISA § 502(a)(2) is liable to restore to the National Fund all losses due to BNY Mellon's breaches.

## REQUEST FOR RELIEF

WHEREFORE, the National Fund respectfully requests that a judgment be entered in its favor and against BNY Mellon as follows:

A.     Declaring that BNY Mellon's conduct complained of herein was in violation of its fiduciary duties under ERISA;

B.     Issuing an order, pursuant to ERISA §§ 409(a) and 502(a)(2), compelling disgorgement and/or restitution and all other relief as the Court may deem appropriate;

C.     Ordering BNY Mellon to pay the National Fund such damages as the National Fund sustained as a result of BNY Mellon's fiduciary breaches;

D.     Imposing a constructive trust in favor of the National Fund upon any amounts by which BNY Mellon was unjustly enriched at the expense of the

National Fund as a result of BNY Mellon's breaches of fiduciary obligations and wrongful conduct;

      E.      Awarding attorneys' fees and costs pursuant to ERISA § 502(g); and

      F.      Granting such other and further relief as this Court may deem just and proper.

Dated this 18th day of June, 2013.

                                s/ Sarah A. Huck
                                Sarah A. Huck
                                Signature by permission
                                shuck@reinhartlaw.com
                                Jeffrey R. Fuller
                                jfuller@reinhartlaw.com
                                Mark A. Cameli
                                mcameli@reinhartlaw.com

                                Reinhart Boerner Van Deuren s.c.
                                1000 North Water Street, Suite 1700
                                Milwaukee, WI 53202
                                Telephone:  414-298-1000
                                Facsimile:  414-298-8097

Jeffrey S. Endick
jendick@slevinhart.com
Laura Offenbacher Aradi
laradi@slevinhart.com
Slevin & Hart, PC
1625 Massachusetts Avenue, N.W.
Suite 450
Washington DC 20036
Telephone: (202) 797-8700
Facsimile: (202) 234-8231

and

s/ Thomas J. Angell
Thomas J. Angell
David Huffman-Gottschling
Jacobs, Burns, Orlove and Hernandez
150 N. Michigan Ave., Ste. 1000
Chicago, Illinois 60601
(312) 372-1646

Attorneys for Plaintiffs

9907852