# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION-INDUSTRY PENSION FUND, MARC PERRONE (TRUSTEE), and WALTER B. BLAKE (TRUSTEE),<br><br>Plaintiffs,<br><br>v.<br><br>THE BANK OF NEW YORK MELLON,<br><br>Defendant. | No. 13 CV 4484<br><br>Judge Manish S. Shah |

## MEMORANDUM OPINION AND ORDER

This is a suit brought against the Bank of New York Mellon under the Employee Retirement Income Security Act. Plaintiffs are the United Food and Commercial Workers International Union-Industry Pension Fund and two of its trustees (collectively, "the Fund"). Under its "securities lending program," BNY Mellon loaned securities that were owned by the Fund to third-party borrowers. The borrowers posted collateral for the loans, which BNY Mellon invested. The borrowers were guaranteed a rate of return; additional investment gains were split between the Fund and BNY Mellon. If the investments earned insufficient gains, the Fund had to replenish the pool of collateral, so that collateral could be returned to the borrowers when they returned the Fund's securities.

The Fund alleges that BNY Mellon breached fiduciary obligations imposed by ERISA, by acting in its own self-interest and by investing the collateral

imprudently. BNY Mellon moves to dismiss the amended complaint. For the reasons discussed below, that motion is denied.

## I. Legal Standards

BNY Mellon's motion is brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure. I therefore construe the complaint in the light most favorable to the Fund, accept as true all well-pleaded facts, and draw reasonable inferences in the Fund's favor. *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915 (7th Cir. 2013). Statements of law, however, need not be accepted as true. *Id.* Rule 12(b)(6) limits my consideration to "allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

To survive BNY Mellon's motion, the complaint must "state a claim to relief that is plausible on its face." *Yeftich*, 722 F.3d at 915 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

II. Facts[1]

    A. The Securities Lending Program

Under its "securities lending program," BNY Mellon loaned securities owned by the Fund to third-party borrowers, and the borrowers posted collateral to secure the loans. Complaint ¶¶ 1, 12–13. Collateral could be cash, government securities, or irrevocable bank letters of credit. Complaint ¶ 12. BNY Mellon invested the cash collateral and promised the borrowers a rate of interest, called the "Borrower Rebate." Complaint ¶ 13. If the interest earned exceeded the Borrower Rebate, the excess was split between the Fund and BNY Mellon. Complaint ¶ 14. But if the investment defaulted or experienced a loss, the Fund alone was responsible for compensating the collateral pool for the shortfall. Complaint ¶¶ 14, 42. Therefore, while BNY Mellon shared in the upside benefits of the collateral investments, it bore none of the downside risk. Complaint ¶¶ 14, 42.

BNY Mellon promoted the securities lending program to the Fund as having "risk controls" and "safeguards." Complaint ¶ 9. BNY Mellon represented that its goal was to avoid relying on "aggressive investment objectives." Complaint ¶ 9. BNY Mellon asserted that, because of its focus on low risk, its clients could expect a consistent income stream without sacrificing safety. Complaint ¶ 9. Based on BNY Mellon's representations and the purpose of the arrangement, the Fund expected BNY Mellon to make very safe investments. Complaint ¶ 16.

---

[1] The facts are taken from the amended complaint [26], which is cited as "Complaint."

The securities lending program was designed to earn interest for the Fund through safe investments with short-term maturity. Complaint ¶ 16. Appropriate investments were to be interest-bearing, short term, stable, highly liquid debt obligations. Complaint ¶ 16. BNY Mellon represented that investments would be made in "short-term high quality money market instruments." Complaint ¶ 9. But BNY Mellon's self-interest conflicted with the purposes of the securities lending program: because it shared in the upside benefit but not the downside risk, BNY Mellon had an incentive to pursue certain long-term investments. Complaint ¶ 14. Those investments, while typically yielding higher interest rates, increased the risk of shortfall or default—risks that the Fund alone bore. Complaint ¶¶ 14, 40.

### B. The Lehman Notes

In March 2007, BNY Mellon used the cash collateral to purchase a $20 million bond note issued by Lehman Brothers Holdings, Inc. Complaint ¶ 18. The Lehman Note had a two-year term. Complaint ¶ 18. The Fund alleges that, at the time of its purchase, the Lehman Note was "substantially exposed to real estate and subprime stress." Complaint ¶¶ 18. The Fund alleges that BNY Mellon knew or should have known that Lehman was heavily invested in securities linked to the subprime mortgage market, which was known to be "in crisis during 2007 and afterwards." Complaint ¶ 22.

### C. The Decline of Lehman Brothers

For the period of June 2007 to August 2007, Lehman stated that it would take write downs of $700 million. Complaint ¶ 23. By the following year, Lehman's write downs were up to $7.8 billion. Complaint ¶ 23. In 2008, Lehman reported that

4

it had $54 billion in exposure to hard-to-value mortgage-backed securities. Complaint ¶ 23. The Fund alleges that the market anticipated Lehman's eventual collapse, as demonstrated by increasing prices of credit default swaps on Lehman Brothers. Complaint ¶ 23. The Fund also identifies the following "warning signs" concerning Lehman's financial health:

- On June 2, 2008, Standard & Poor's downgraded Lehman due to business weakness and the potential for further write-offs. Complaint ¶ 26.

- On June 16, 2008, Moody's put Lehman on review for downgrade. Complaint ¶ 26.

- On September 8, 2008, Standard & Poor's indicated that Lehman was under review for a downgrade. Complaint ¶ 27.

- On September 10, 2008, Lehman reported a larger-than-anticipated third quarter loss and announced that it was taking action to attempt to stabilize its position. Both Moody's and Standard & Poor's publicly stated that they would downgrade Lehman if a transaction saving the firm did not materialize. Complaint ¶ 27.

**D. BNY Mellon's Alleged Failure to React to Lehman's Decline**

The Fund alleges that while Lehman declined—and, correspondingly, the Lehman Note declined in value—BNY Mellon made no effort to mitigate the Fund's losses by selling part or all of the Lehman Note. Complaint ¶ 30. Allegedly, BNY Mellon instead followed a "buy and hold" approach, and therefore failed to adequately monitor the investment. Complaint ¶¶ 31, 49. Further, the Fund alleges that BNY Mellon was aware of Lehman's financial instability. Complaint ¶ 26. BNY Mellon allegedly recognized the increased risk and took action to protect *its own* investments with Lehman (by requesting additional collateral), but took no such action to protect the Fund. Complaint ¶ 42.

5

**E. The Fund's Loss**

As of April 2008, the Lehman Note was valued at 97.37% of its par value. Complaint ¶ 29. In July 2008, it was at 97.04%. Complaint ¶ 29. During 2012, BNY Mellon sold the Lehman Note for $4,940,428.41—about 24.7% of par value. BNY Mellon waived some of its fees; after the fee waiver, the Fund's loss exceeded $11 million. Complaint ¶ 34.

**III. Analysis**

**A. Count I (Violation of 29 U.S.C. § 1104)**

In Count I, the Fund alleges that BNY Mellon violated 29 U.S.C. § 1104, which is titled "[f]iduciary duties."[2] Under subsection (a)(1), titled "[p]rudent man standard of care," BNY Mellon was required to discharge its duties—

- solely in the interest of the Fund (§ 1104(a)(1));

- for the exclusive purpose of (i) providing benefits to the Fund; and (ii) defraying reasonable expenses of administering the plan (§ 1104(a)(1)(A));

- with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims (§ 1104(a)(1)(B));

- by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so (§ 1104(a)(1)(C)); and

- in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with other provisions of ERISA (§ 1104(a)(1)(D)).

---

[2] The Fund alleges that BNY Mellon was a fiduciary under ERISA. Complaint ¶¶ 4, 10, 44, 55. BNY Mellon does not argue otherwise.

6

The Fund alleges that BNY Mellon failed to diversify the investments, and states that the Lehman Note constituted approximately 5% of the collateral pool. Complaint ¶¶ 18, 45. But as BNY Mellon pointed out in its motion to dismiss ([39] at 9), the Fund says nothing specific about the remaining 95%. *See* Complaint ¶ 16 (alleging generally that the collateral pool had a "heavy concentration in financial services company debt instruments").) The Fund did not respond to BNY Mellon's argument, and rightly so because the allegations concerning a failure to diversify are barebones. Similarly, the Fund alleges that BNY Mellon failed to follow the documents governing the plan (Complaint ¶ 50), but the only specific allegation concerns a debt obligation (referred to as the "Sigma Note") that the Fund concedes is currently irrelevant. [41] at 3 n.2. *See* Complaint ¶ 38. Thus, on their own, the allegations that BNY Mellon failed to diversify the investments, or failed to follow the plan documents, fail to state a claim.

But the Fund's allegations concerning BNY Mellon's diligence and loyalty are more substantial. BNY Mellon argues that the allegations use "20/20 hindsight" and are based solely on the fact that the Lehman Note turned out to be a bad investment. *See, e.g.*, [39] at 1, 10–12. It is true that fiduciary duties are not breached merely because an investment loses money. *Jenkins v. Yager*, 444 F.3d 916, 926 (7th Cir. 2006). *See also Fifth Third Bancorp v. Dudenhoeffer*, 134 S.Ct. 2459, 2471–72 (2014) ("[W]here a stock is publicly traded, allegations that a fiduciary should have recognized . . . that the market was over- or undervaluing the stock are implausible as a general rule, at least in the absence of special

7

circumstances.""). But, in two specific ways, the Fund alleges more than simply that BNY Mellon made an investment that lost money.

### 1. The Fund States a Claim by Alleging that Purchasing the Lehman Note was Imprudent at the Time of Purchase.

First, the Fund alleges that investing in the Lehman Note was imprudent *at the time of purchase*, because its relatively longer term and lower liquidity were inconsistent with the purpose of the securities lending program. Complaint ¶¶ 16, 19, 21, 52. *See Jenkins*, 444 F.3d at 925 (prudence is evaluated in light of the character and aims of the particular investment plan); *Nelson v. Brinson Partners, Inc.*, 2004 U.S. Dist. LEXIS 26577, at *13–14 (N.D. Ill. 2004) (denying motion to dismiss where the "complaint point[ed] to factors that relate to the wisdom of the [] investment at the time it was made.").

The Fund also alleges facts that suggest a plausible *reason* that BNY Mellon imprudently invested in the Lehman Note: BNY Mellon shared in the upside benefits of collateral investments, but not in the downside risks. Complaint ¶¶ 14, 39. So investing in the Lehman Note increased BNY Mellon's likely return, but exposed the Fund to excess risk. Complaint ¶ 39. The Fund therefore alleges that "BNY Mellon put its own interest . . . above its duty as a fiduciary to protect the National Fund's assets." Complaint ¶ 39; *see also* Complaint ¶¶ 40, 51.

BNY Mellon argues that the Lehman Note was sufficiently liquid because it could have been sold. [39] at 9. But the Lehman Note's level of liquidity and other financial characteristics, and whether those characteristics were consistent with the purpose of the securities lending program, are factual issues that cannot be resolved

8

on a motion to dismiss. The Fund's allegations of a lower liquidity relative to the purposes of the securities lending program and BNY Mellon's duty of prudence are sufficient to state a plausible claim, subject to actual proof at a later stage.

### 2. The Fund States a Claim by Alleging that BNY Mellon Failed to Monitor the Investment and Reevaluate its Prudence.

Second, the Fund alleges that BNY Mellon adopted a "buy and hold" strategy, and therefore failed to monitor the investment. Complaint ¶¶ 19–20, 31, 49.[3] Such a failure breaches the duty of prudence, even if adequate monitoring would have resulted in the same action (or inaction). *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 796–97 (7th Cir. 2011); *Armstrong v. LaSalle Bank N.A.*, 446 F.3d 728, 734 (7th Cir. 2006) ("A trustee who simply ignores changed circumstances that have increased the risk of loss to the trust's beneficiaries is imprudent."); *Bd. of Trs. of the Operating Eng'rs Pension Trust v. JPMorgan Chase Bank, N.A.*, 2013 U.S. Dist LEXIS 43746, at *27–28 (S.D.N.Y. 2013) ("One 'hold' decision may have been based on careless imprudence, another may have been based on careful prudence. That the resulting loss is the same does not relieve the former of, nor condemn the latter to, liability.").

---

[3] The plaintiff in *St. Vincent*, a case relied on by BNY Mellon, did not allege a failure to monitor and reevaluate. *See Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt., Inc.*, 712 F.3d 705, 722 (2d Cir. 2013) ("To be sure, a rapid decline in the price of a security would likely lead a prudent fiduciary to *investigate* whether it was still prudent to hold that investment. But the Amended Complaint does not allege that Morgan Stanley failed to conduct such an inquiry, nor does the decline in price necessarily give rise to that inference.") (emphasis in original).

9

BNY Mellon argues that the Fund's "buy and hold" allegation is "unsupported by factual allegations." But the alleged fact that BNY Mellon adopted a "hold" strategy and therefore did not monitor the Lehman Note is a sufficient factual allegation that stands on its own without further explanation (and, if untrue, is easy to refute at the appropriate stage). Furthermore, the complaint *does* contain additional relevant allegations. Specifically, the Fund alleges that BNY Mellon was aware that Lehman's financial stability was uncertain. Complaint ¶ 26. The Fund further alleges that in August 2008 (the month before Lehman's bankruptcy filing), BNY Mellon "believed it bore intra-day credit risk from Lehman." Complaint ¶ 42. BNY Mellon allegedly recognized the increased risk and took action to protect *its own* investments with Lehman (by requesting additional collateral), but took no such action to protect the Fund. Complaint ¶ 42. These allegations support the Fund's theory that BNY Mellon failed to react to changed circumstances. *See, e.g.*, *Operating Eng'rs Pension Trust*, 2013 U.S. Dist LEXIS 43746, at *29 (denying motion to dismiss where "[t]he [complaint] allege[d] specific facts in support of a claim that defendant took actions to reduce and/or mitigate its own risk exposure associated with Lehman investments, while failing to take similar action with respect to the Lehman Notes [held for plaintiff's securities lending program].").

BNY Mellon argues that it could not sell the Lehman Notes based on "inside" information, because that would violate securities laws. [39] at 14. And BNY Mellon submitted the Supreme Court's recent *Fifth Third* opinion as supplemental

authority supporting that argument. [50]. In *Fifth Third*, the Supreme Court made clear that "[t]o state a claim for breach of the duty of prudence on the basis of *inside information*, a plaintiff must plausibly allege an alternative action that the defendant could have taken *that would have been consistent with the securities laws* . . . ." 134 S.Ct. at 2472 (emphases added). But given that the Fund alleges that BNY Mellon *did* act—to protect its own investments, but not the Fund's—a reasonable inference at this stage is that BNY Mellon possessed some information suggesting Lehman was increasingly at risk, and acting on that information would not have been illegal.

Finally, BNY Mellon argues the merits of the case. It notes that Lehman filed for bankruptcy just six months before the Lehman Note was scheduled to mature; had the note matured first, the Fund would have been paid in full. [43] at 5. BNY Mellon also observes that the Lehman Note was trading near par value through July 2008. [39] at 4. In short, BNY Mellon asks me to rule that it did not act imprudently. But the Fund has not pleaded itself out of court. The Fund has plausibly alleged that a prudent fiduciary would have taken a different course of action, even with an approaching maturity date and with the Lehman Note trading near (but below) par.[4] *See, Operating Eng'rs Pension Trust*, 2013 U.S. Dist LEXIS 43746, at \*32–33 (denying motion to dismiss where "plaintiff alleges that once the price dipped below [par], consistent with the conservative investment objectives for

---

[4] Further, the Fund accurately points out that BNY Mellon asks me to find that the Lehman Note was a senior note that Lehman would have paid off before its other obligations. [39] at 10–11; [41] at 10. Doing so would not be appropriate at this stage.

[plaintiff's securities lending program], defendant should have taken steps to mitigate its risk").

What the prevailing circumstances were at various times, what investigations BNY Mellon conducted, what analyses led to its decision to hold, and whether a prudent fiduciary would have acted differently, are all factual inquiries not properly resolved at this stage.

### 3. Count I—Conclusion

I find that the Fund has alleged more than just that BNY Mellon made an investment that lost money. Other courts have denied motions to dismiss under like circumstances.[5] I join them and deny BNY Mellon's motion to dismiss Count I of the amended complaint.

### B. Count II (Violation of 29 U.S.C. § 1106)

In Count II, the Fund alleges that BNY Mellon engaged in "prohibited transactions" in violation of 29 U.S.C. § 1106(b). That provision, titled "[t]ransactions between plan and fiduciary," states:

> A fiduciary with respect to a plan shall not—
>
> (1) deal with the assets of the plan in his own interest or for his own account,
>
> (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the

---

[5] *See, e.g., Int'l Bhd. of Teamsters Union Local No. 710 Pension Fund v. Bank of N.Y. Mellon Corp.*, 2014 U.S. Dist. LEXIS 15246, at *19–20 (N.D. Ill. 2014); *Diebold v. Northern Trust Invs., N.A.*, 2010 U.S. Dist. LEXIS 93993, at *10–11 (N.D. Ill. 2010); *La. Firefighters' Ret. Sys. v. N. Trust Invs.*, 2011 U.S. Dist. LEXIS 49525, at *10 (N.D. Ill. 2011); *Bd. of Trs. of the S. Cal. IBEW-ENCA Defined Contribution Plan v. Bank of N.Y. Mellon Corp.*, 2011 U.S. Dist LEXIS 142367, at *14–18 (S.D.N.Y. 2011).

> interests of the plan or the interests of its participants or beneficiaries, or
>
> (3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

The Fund alleges that BNY Mellon violated clauses 1 and 2, by investing the collateral "on behalf of" itself (rather than the Fund) and in its own interest (rather than the Fund's). Complaint ¶ 56.

The alleged incentive structure (through which BNY Mellon shared in the upside but not the downside), Complaint ¶ 14; the selection of an allegedly inappropriate long-term debt obligation, Complaint ¶ 19; and BNY Mellon's alleged actions to further secure its own investments in Lehman but not the Fund's, Complaint ¶ 14, plausibly state a violation of § 1106. *See, e.g.*, *Operating Eng'rs Pension Trust*, 2013 U.S. Dist LEXIS 43746, at *34 ("Plaintiff also alleges sufficient facts to support a breach of the duty of loyalty by [defendant]. For instance, the [complaint] alleges that individuals involved with the [securities lending program] had information that should have led them to take action with respect to the Lehman Notes—instead, according to plaintiff, defendant gambled that [] Lehman would survive when it was the Plan's investment at risk (and when [plaintiff] stood to obtain 30–40% of profits if the investment paid off, and risked nothing if it did not), while reducing or eliminating its own exposure when its own money was at risk. These facts . . . are sufficient to state a claim for a breach of the duty of loyalty.").

BNY Mellon argues that a failure to sell is not a "transaction," and § 1106 covers only prohibited "transactions." [39] at 16. Thus, BNY Mellon argues that Count II should be dismissed "to the extent" it is based on a failure to sell the Lehman Note (as opposed to the initial decision to buy the Lehman Note). [39] at 2. Of course, "to the extent" that Count II is based on the initial purchase of the Lehman Note, BNY Mellon's argument is inapplicable. And just as Judge Ellis did with the similar complaint in *International Brotherhood of Teamsters*, 2014 U.S. Dist. LEXIS 15246, at *23, I understand the Fund's claim to encompass the original purchase of the Lehman Note, by BNY Mellon and for self-interested reasons, rather than in service to the Fund, which is a "cognizable transaction." *Id.*

Further, BNY Mellon states that its argument is based on the "plain language" of § 1106 ([39] at 16), but § 1106(b)(1) does not use the word "transaction"—it states only that "[a] fiduciary with respect to a plan shall not deal with the assets of the plan in his own interest or for his own account[.]" 29 U.S.C. § 1106(b)(1) (internal marks omitted). True, the statutory heading uses the word "transactions," but "[a]s a general rule, the title of a statute cannot limit the plain meaning of the text. A statute's heading is of use only when it sheds light on some ambiguous word or phrase." *United States v. BDO Seidman, LLP*, 492 F.3d 806, 823 (7th Cir. 2007) (quoting *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998)) (internal citations and alterations omitted).

I therefore reject BNY Mellon's argument that an affirmative "transaction" is required but not plausibly alleged, and I deny BNY Mellon's motion to dismiss Count II of the amended complaint.

**IV.    Conclusion**

For the reasons discussed above, BNY Mellon's motion to dismiss [38] is denied.

ENTER:

_____
Manish S. Shah
United States District Judge

Date:  9/16/14

15